2011 UT 17

Parker JENSEN, a minor, by and through his parents and natural guardians, Barbara and Daren JENSEN; Barbara Jensen, individually, and Daren Jensen, individually, Plaintiffs and Appellants,

v.

Kari CUNNINGHAM; Richard Anderson; Lars M. Wagner; Karen H. Albritton; Susan Eisenman; and Jane and John Doe, Defendants and Appellees.

No. 20090277.

Supreme Court of Utah.

March 29, 2011.

468

Roger P. Christensen, Karra J. Porter, Sarah E. Spencer, Salt Lake City, for plaintiffs.

Mark L. Shurtleff, Att'y Gen., Bridget K. Ramano, Joni J. Jones, Asst. Att'ys Gen., David G. Williams, Andrew M. Morse, R. Scott Young, Salt Lake City, for defendants.

Justice PARRISH, opinion of the Court:

## INTRODUCTION

¶ 1 This appeal is the latest stage in a protracted dispute between the State of Utah and Barbara and Daren Jensen regarding the proper medical care of the Jensens' son, Parker. In it, we must balance the right of parents to direct the medical care of their child with the State's interest in protecting the health and safety of children within its borders.

¶ 2 A doctor who was treating Parker reported the Jensens to the Utah Division of Child and Family Services for suspected medical neglect after the doctor concluded the Jensens were refusing Parker lifesaving medical care. After a months-long process in the juvenile court, the Jensens sued the state of Utah and various state actors in Utah State court, alleging violations of the Jensens' state and federal constitutional rights. The defendants removed the matter to the federal district court, which entered summary judgment against the Jensens on their claims asserting that the defendants violated their federal constitutional rights. However, the federal district court remanded the Jensens' state law claims to the Utah district court, noting that the claims presented "important issues of state law."

¶ 3 On remand, the state district court applied collateral estoppel and dismissed the plaintiffs' state claims. The court applied collateral estoppel because it concluded that the Utah Constitution provided no broader rights than the federal constitution and it determined that the facts, the alleged harm, and the analysis of the Jensens' state law claims were the same as those that the federal district court had already considered and dismissed.

¶ 4 We hold that the state district court erred in applying collateral estoppel, but affirm the district court's order on alternative grounds that are apparent in the record. Specifically, we hold that two defendants are absolutely immune from suit and that the claims against the remaining three defendants fail because, as a matter of law, the facts do not demonstrate a "flagrant violation" of the Jensens' state constitutional rights.

## FACTUAL AND PROCEDURAL BACKGROUND [1]

¶ 5 This controversy began on April 30, 2003, when Barbara Jensen took her 12-year-old son Parker to an oral surgeon, Dr. Christensen, to have a small growth under Parker's tongue removed. Dr. Christensen sent a sample of the removed tissue to Laboratory Corporation of America ("LabCorp") for analysis. The lab determined that the growth was malignant (cancerous). Dr. Christensen then referred the Jensens to Dr. Muntz, an ear, nose, and throat specialist at Primary Children's Medical Center ("Primary Children's") in Salt Lake City, Utah.

¶ 6 After examining Parker, Dr. Muntz referred him to the oncology department at Primary Children's, where he met with Dr.

---

1. When reviewing a district court's grant of summary judgment, we consider "the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party."

*Orvis v. Johnson*, 2008 UT 2, ¶ 6, 177 P.3d 600 (internal quotation marks omitted). In this case, that party is the Jensens.

Wagner. On May 9, Dr. Wagner examined Parker, but did not immediately offer any diagnosis because Primary Children's pathology department had not yet completed its own testing.

¶ 7 After completing testing on May 20, the Primary Children's pathology department diagnosed the growth as "Ewings Sarcoma/Peripheral Primitive Neuroectodermal Tumor," otherwise known as Ewing's Sarcoma. The diagnosis from Primary Children's was based on the conventional test for Ewing's—an immunohistochemical staining—and the appearance of tumor cells. Ewing's may also be diagnosed through cytogenetic and molecular genetic testing. Under either test, a positive result may be manifested by a chromosomal translocation, but the absence of a translocation does not mean it is not Ewing's. Neither genetic nor molecular testing was performed on Parker's tissue sample,[2] although the pathology report contains a "comment" that reads, "In the event of excision of additional lesional tissue from this site, cytogenetic studies and freezing of tissue for possible molecular ancillary studies may be informative." Nonetheless, the two pathologists who reviewed the testing were confident in the diagnosis. One, Dr. Lowichik, estimated her confidence in the diagnosis to be "in the high 90 percent." The other, Dr. Coffin, testified that the Ewing's diagnosis was rendered with near certainty.

¶ 8 After reviewing the pathology report, Dr. Wagner spoke at length with Dr. Coffin, who was the head of the pathology department at Primary Children's, and asked her whether molecular testing was indicated for Parker. Dr. Coffin said she was comfortable with the testing that had been conducted.

¶ 9 On May 21, Dr. Wagner met with the Jensens to discuss Parker's care. Dr. Wagner expressed his confidence in the Ewing's diagnosis and his desire for prompt initiation of chemotherapy. Dr. Wagner told the Jensens that, if left untreated, Ewing's sarcoma was expected to be fatal. He explained the difference between localized and nonlocalized

Ewing's, and informed the Jensens that the cure rate for localized disease—where there is no evidence of cancer in places other than where it was discovered—was approximately 60 percent to 70 percent when treated with recommended chemotherapy, but that the cure rate for nonlocalized disease was as low as 20 percent. He also explained that, if treated with surgery alone, Parker had a low chance of survival.

¶ 10 Dr. Wagner ordered radiographic examinations on Parker's neck, thorax, chest, and skull to determine whether the cancer had spread. All of these additional tests were negative. Dr. Wagner communicated to the Jensens his concern that there might be undetectable microscopic metastatic cancer cells throughout Parker's body that needed to be treated with chemotherapy. The Jensens were bothered by the idea that Parker could have what they termed "invisible cancer." In fact, Ms. Jensen testified that she thought the notion was "crazy."

¶ 11 When the Jensens asked whether there were any other tests that could be done to confirm the Ewing's diagnosis, Dr. Wagner told them there were no other tests required to confirm the diagnosis and that he was sure it was Ewing's. The Jensens nonetheless asked Dr. Wagner to send a sample of Parker's tissue to Dr. Grier, an oncologist at the Dana–Farber Cancer Institute at Harvard University ("Dana–Farber"), for a second opinion. Dr. Wagner complied with the Jensens' request and sent the tissue to Dana–Farber. The Jensens ultimately canceled the consultation. Dr. Wagner has testified that the Dana–Farber test was not done because the Jensens had determined their insurance company would not pay for the second opinion and the Jensens were unwilling to pay for it. The Jensens contend, however, that the second opinion was canceled because they felt it would not be truly independent.

¶ 12 On May 28, 2003, the Jensens consulted with Dr. Judith Moore, a family doc-

---

**2.** Cytogenetic testing may be performed only on fresh or frozen tissue, and is therefore not possible when tissue is placed in formalin or paraffin. In contrast, although not optimal, molecular testing can be performed on tissue samples that have been placed in formalin or paraffin. Because the tissue removed from Parker's mouth by Dr. Christensen was placed in formalin or paraffin, cytogenetic testing could not be performed on that specimen.

tor at the Modern Health Clinic (the "Clinic") in Bountiful, Utah. Ms. Jensen's father had received treatment from Dr. Moore for prostate cancer. Dr. Moore questioned the Ewing's diagnosis because "all the evidence except for the [Primary Children's pathology testing] were negative for cancer."

¶ 13 Dr. Moore's treatment of Ms. Jensen's father had included a form of therapy called Insulin Potentiation Therapy (IPT). The Jensens asked professionals at the Clinic whether IPT might be a potential treatment if Parker had Ewing's, and they requested information to take to their oncologist. The Jensens were provided some printed materials and directed to websites that contained additional information on IPT, even though an employee of the Clinic who had previously administered IPT later testified that she believed IPT "was not a safe and effective treatment" for Ewing's.

¶ 14 The Jensens met again with Dr. Wagner on May 29, 2003. A social worker was also present. At the meeting, the Jensens asked Dr. Wagner for a Positron Emission Tomography ("PET") scan, a procedure that Dr. Moore had recommended "to make sure there was no cancer throughout the body." Dr. Wagner did not order the PET scan, explaining that it would not be useful in Parker's situation. Dr. Wagner explained to the Jensens that a negative PET scan would not change the need for chemotherapy because it could not detect microscopic cancer cells, and he again expressed the need for immediate chemotherapy.

¶ 15 The Jensens refused to allow Dr. Wagner to begin treating Parker with chemotherapy. The Jensens again asked Dr. Wagner if there were other tests to confirm the Ewing's diagnosis. Dr. Wagner said there were not. Dr. Wagner's entry in his medical log, which was made after the meeting, indicated that the Jensens were in agreement with the Ewing's Sarcoma diagnosis. He also noted that the Jensens were "quite interested in pursuing care at an alternative medicine clinic in Bountiful, Utah, which would provide insulin potentiation therapy (IPT)." Dr. Wagner had informed the Jensens that IPT is not an accepted therapy and could not be given through Pri-

mary Children's. Nonetheless, they asked him to "look into" IPT, and Dr. Wagner said that he would.

¶ 16 On June 5, Dr. Wagner discussed with Mr. Jensen the results of his research on IPT. Dr. Wagner communicated the following to Mr. Jensen: IPT is not approved by federal regulatory agencies for the treatment of any types of cancer; there is no evidence that IPT is an effective treatment for Ewing's; no safety information is available for IPT; treatment with IPT would increase the likelihood of chemotherapy resistance; and use of IPT would dramatically increase the risk of Parker relapsing and dying from his disease. Dr. Wagner also informed the Jensens that he was legally and ethically bound to involve state protective services if Parker's best medical interests were not being addressed.

¶ 17 By early June 2003, it was clear that the Jensens and Dr. Wagner had significant differences in opinion about Parker's medical care. To address these differences, a meeting was held on June 9, 2003 with the Jensens, Dr. Wagner, Dr. Lemons (head of the oncology department at Primary Children's), a Primary Children's social worker, and the head of quality assurance for the hospital. At the meeting, Dr. Wagner again expressed the need for immediate chemotherapy. The Jensens refused to consent to chemotherapy and stated that they planned to begin IPT. Dr. Wagner had informed the Jensens that IPT would interfere with traditional chemotherapy. Therefore, the Jensens thought that saying they were going to commence IPT would perhaps cause Primary Children's to "back off," thinking that traditional chemotherapy would no longer work. The Jensens contend they refused chemotherapy not because they planned on commencing IPT, but because they desired confirmation through additional tests, which Dr. Wagner had determined were unnecessary. At some point during the meeting, the head of quality assurance for Primary Children's told the Jensens that a referral to the Division of Child and Family Services ("DCFS") might be required. The Jensens left the meeting telling the Primary Children's staff that they

were "fired" and that the Jensens would find another hospital to treat Parker.

¶ 18 On June 12, Dr. Wagner sought the advice of Dr. David Corwin, the Division of Child and Family Services' ("DCFS") liaison at Primary Children's, as to whether the Jensens' refusal to begin chemotherapy warranted a report of suspected medical neglect to DCFS. In his written request for consultation, Dr. Wagner informed Dr. Corwin that the Jensens were "refusing conventional therapy and seeking unproven alternative treatment methods."

¶ 19 Dr. Corwin attempted to schedule a meeting with the Jensens and Dr. Wagner to discuss the impasse regarding Parker's treatment, but these attempts failed. The Jensens claim Dr. Wagner told Dr. Corwin there was no time for a meeting because Parker could die without immediate chemotherapy. Regardless, having failed to resolve the treatment conflict, Dr. Corwin decided that the Jensens should be reported to DCFS for refusing what the doctors considered medically necessary treatment.

¶ 20 On June 16, representatives from the hospital and DCFS held a regularly scheduled meeting at Primary Children's. Dr. Wagner, Dr. Corwin, and a social worker from DCFS, Kari Cunningham, were also present. At this meeting and in a case summary submitted to DCFS, Dr. Wagner summarized his interaction with the Jensens. A formal referral to DCFS was made that same day.

¶ 21 The case was assigned to Ms. Cunningham. Based on reports from Dr. Wagner and Dr. Corwin, and the information she obtained from the June 16 meeting, Ms. Cunningham was under the impression that Parker's case was a medical emergency and that something needed to be done within a matter of hours or days. On June 18, she filed in the Third District Juvenile Court a Verified Petition and Motion to Transfer Custody and Guardianship. In the petition, Ms. Cunningham alleged, in essence, that the Jensens were committing medical neglect by refusing to treat Parker with chemotherapy. Ms. Cunningham did not conduct an independent investigation into the claims, nor did she meet with the Jensens to get their side of the

story. Rather, she apparently relied solely on the accounts from the doctors at Primary Children's.

¶ 22 On June 19, Ms. Jensen took Parker to Dr. Christensen, the oral surgeon who had performed the first excision of Parker's tumor. Dr. Christensen took another sample from the floor of Parker's mouth in the area where the original tumor had been removed. The tissue was sent to a University of Washington Pathology Laboratory. That lab reported on June 24, 2003 that the tissue contained Ewing's sarcoma.

¶ 23 Also on June 19, the Jensens took Parker to see Dr. John Thompson at LDS Hospital in Salt Lake City. Dr. Thompson examined Parker, and reviewed the Primary Children's chart, including the LabCorp and Primary Children's pathology reports and the radiographic tests that Primary Children's had done as part of the staging process for Parker's treatment. He told the Jensens that he concurred with the Ewing's diagnosis and Dr. Wagner's recommended course of treatment.

¶ 24 The Jensens first appeared before the juvenile court on June 20. They expressed their interest in obtaining further testing to definitively determine Parker's diagnosis. Susan Eisenman represented DCFS in the juvenile court proceedings and became the primary Assistant Attorney General on Parker's case. The juvenile court continued the hearing until July 10, to allow the parties time to negotiate a stipulation.

¶ 25 The Jensens attempted to have other doctors evaluate Parker, but the court did not approve any of these doctors because they were not board certified oncologists. At the July 10 hearing, the parties stipulated to an independent evaluation and subsequent treatment at the Children's Hospital of Los Angeles ("Children's Hospital") by Dr. Tishler. Genetic testing would be performed to satisfy the Jensens' desire for a more definitive diagnosis. But when the Jensens arrived at the Children's Hospital, Dr. Tishler indicated he was recommending chemotherapy based on the pathology reports from Primary Children's in Utah before his own test results were complete. In essence, the Jen-

sens allege that Dr. Tishler was deferring to the Primary Children's diagnosis. Based on this experience, the Jensens continued to look for another doctor to perform the genetic testing and give them what they considered a truly independent second opinion and treatment options.

¶ 26 The court had set August 8, 2003 as the date for Parker to begin chemotherapy based on the stipulated agreement and Dr. Tishler's orders. The court also set an evidentiary hearing for August 20, 2003 to resolve DCFS's petition for custody. According to the Jensens, because they had lost faith in the independence of Dr. Tishler, they did not begin chemotherapy for Parker on August 8. They figured they could explain their reasons at the August 20 hearing, and took Parker on a boating trip in Idaho. They planned to take Parker to the Burzynski Clinic in Houston for further testing and treatment following the trip, but when they failed to begin chemotherapy on August 8, Ms. Eisenman sought a hearing with the juvenile court for the purpose of seeking authorization to take Parker into protective custody.

¶ 27 A hearing was held on August 8. The Jensens' lawyer was present at the hearing and indicated that the Jensens had plans to take Parker to the Burzynski Clinic for evaluation and that they would begin treatment as directed by the Clinic. The Jensens' proposal to take Parker to another doctor that had not been approved by the juvenile court prompted Ms. Cunningham to include Dr. Albritton, who had replaced Dr. Wagner at Primary Children's, in the hearing. Ms. Eisenman asked Dr. Albritton whether the Burzynski Clinic was qualified to treat Parker. Dr. Albritton indicated that Dr. Burzynski was not a board certified oncologist, that his clinic was known for providing extremely controversial therapy and that for these reasons it was not an appropriate clinic to treat Parker.

¶ 28 Based on this information and the Jensens' failure to start chemotherapy as they had agreed in the stipulation, Ms. Eisenman filed an Application to Take a Child into Protective Custody. The application was supported by affidavits from Ms. Cun-

ningham and Dr. Wagner. The juvenile court issued an order authorizing DCFS to take Parker into protective custody, finding that it was in Parker's best interest. But the warrant could not be served because the Jensens were in Idaho. This prompted the court to issue a bench warrant for the arrest of Mr. and Mrs. Jensen. And, to make the warrant effective in Idaho, an adult arrest warrant subject to a national database was necessary. Ms. Eisenman, Ms. Cunningham, and Parker's guardian ad litem informed the Salt Lake County District Attorney's Office of the situation. This resulted in criminal charges being filed against the Jensens, including one count of custodial interference and one count of kidnaping.

¶ 29 On August 16, 2003, Mr. Jensen was arrested in Idaho, where he spent four days in jail. Upon Mr. Jensen's arrest, Ms. Jensen took Parker to Houston to see Dr. Burzynski. But the Burzynski Clinic refused to see Parker because the juvenile court order had granted legal custody to the State of Utah and the Clinic did not have consent from the State to treat Parker.

¶ 30 At this time, Richard Anderson, director of DCFS, was called by the Governor's office to assist in the case. Mr. Anderson flew to Idaho to meet with Mr. Jensen to try to negotiate an agreement for the Jensens to return to Utah and begin a treatment plan for Parker. Ultimately, Mr. Anderson was able to reach a stipulation with the Jensens, in which they agreed to take Parker to Dr. Johnston, a board certified oncologist at St. Luke's Hospital in Boise, Idaho, and to submit to his treatment recommendations. However, like Dr. Tishler, Dr. Johnston recommended chemotherapy after reviewing Parker's file without ordering any independent diagnostic tests. The Jensens were again dismayed at the lack of an independent diagnosis and refused to work with Dr. Johnston.

¶ 31 DCFS ultimately conceded that the Jensens would not submit to chemotherapy and that it was unreasonable to force an unwilling 13-year-old boy to undergo chemotherapy. Accordingly, DCFS dismissed the Verified Petition and the Jensens entered a plea agreement with the State on the custodi-

al interference charges in exchange for the State's promise to dismiss the kidnaping charges.

¶ 32 In 2005, the Jensens filed a complaint in Utah's Third District Court against the State of Utah, Ms. Cunningham, Mr. Anderson, Dr. Wagner, Dr. Corwin, Dr. Coffin, Dr. Albritton, and Ms. Eisenman.[3] In the complaint, the Jensens asserted the following ten claims for relief: (1) 42 U.S.C. § 1983 violation of parents' Fourteenth Amendment due process right to direct medical care of their child; (2) 42 U.S.C. § 1983 violation of First and Fourteenth Amendment right to familial association; (3) 42 U.S.C. § 1983 violation of Fourth Amendment for malicious prosecution; (4) 42 U.S.C. § 1983 violation of Parker's Ninth Amendment right to refuse unwanted medical treatment; (5) violation of right to "enjoy and defend" lives under article I, section 1 of the Utah Constitution; (6) violation of due process under article I, section 7 of the Utah Constitution; (7) violation of the right to be free from unreasonable searches and seizures under article I, section 14 of the Utah Constitution; (8) violation of the right to familial association under article I, section 25 of the Utah Constitution; (9) state common law wrongful initiation of civil/criminal process; and (10) state common law intentional infliction of emotional distress.

¶ 33 The defendants removed the case to federal court and promptly filed motions to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). The federal district court dismissed the fourth and eighth claims in their entirety and various claims against specific defendants, but allowed others to proceed. After extensive discovery, the defendants filed motions for summary judgment. The court granted defendants' motions for summary judgment on all federal claims. Specifically, the court held that defendants Eisenman and Albritton were abso-

lutely immune from the Jensens' federal claims because the conduct they allegedly engaged in was performed during activities "sufficiently connected with the judicial process." The court also determined that defendants Wagner, Cunningham, and Anderson were entitled to qualified immunity from the Jensens' federal claims. The federal court declined to exercise supplemental jurisdiction over the remaining state law claims and remanded them to state court, finding that they "present[ed] important questions of state law." *P.J. ex rel. Jensen v. Utah,* No. 2:05–CV–739 TS, 2008 WL 4372933, at *31, 2008 U.S. Dist. LEXIS 72334, at *98 (D.Utah Sept.22, 2008). On appeal, the Court of Appeals for the Tenth Circuit upheld the dismissal of the federal claims. *P.J. ex rel. Jensen v. Wagner,* 603 F.3d 1182 (10th Cir. 2010).

¶ 34 On remand to Utah's Third District Court, the defendants again filed motions for summary judgment, arguing that the federal court ruling required dismissal of the Jensens' state law claims. The court granted the motions, reasoning that the issue preclusion arm of the doctrine of res judicata barred the Jensens from arguing that their state constitutional rights had been violated. The court relied on issue preclusion because it determined there was no historical or textual basis for interpreting the Utah Constitutional provisions as providing any broader protections than their federal counterparts. And, because the federal courts had conclusively decided that the Jensens had not produced evidence to form the basis of a federal constitutional claim, they similarly could not prove state constitutional claims when the federal and state constitutions provided substantially similar protection. The Jensens appeal the state district court ruling dismissing their claims, arguing that it improperly applied issue preclusion to bar their state constitutional claims.[4]

---

3. The complaint also named as a defendant Intermountain Health Care ("IHC"). However, the parties stipulated that none of the defendants was an IHC employee, and IHC was voluntarily dismissed from the case. Consequently, IHC is not part of the case or this appeal.

4. In their brief, the Jensens make only a passing reference to their intentional tort claims, choos-

ing instead to focus solely on their state constitutional claims. For this reason, we consider the intentional tort claims waived and affirm the district court's dismissal of them. Utah R.App. P. 24(a)(9); *see also; State v. Wareham,* 772 P.2d 960, 966 (Utah 1989) (declining to reach an issue raised by a party where the party's "brief totally

¶ 35 We have jurisdiction to review the district court order under Utah Code section 78A–3–102(3)(j) (Supp.2010).

## STANDARDS OF REVIEW

¶ 36 We review a district court's grant of summary judgment for correctness and afford no deference to the court's legal conclusions. *See Orvis v. Johnson,* 2008 UT 2, ¶ 6, 177 P.3d 600. We affirm a grant of summary judgment only if there are no disputed issues of material fact and, with the facts and all reasonable inferences viewed in the light most favorable to the nonmoving party, the moving party is entitled to judgment as a matter of law. Utah R. Civ. P. 56(c). We may affirm a grant of summary judgment upon any grounds apparent in the record. *Bailey v. Bayles,* 2002 UT 58, ¶ 10, 52 P.3d 1158.

¶ 37 Interpretation of the Utah Constitution and the application of collateral estoppel are both questions of law that we review for correctness. *See Dexter v. Bosko,* 2008 UT 29, ¶ 5, 184 P.3d 592; *Macris & Assocs., Inc. v. Neways, Inc.,* 2000 UT 93, ¶ 17, 16 P.3d 1214.

## ANALYSIS

¶ 38 In this case, the state district court granted summary judgment in favor of all defendants because it determined that collateral estoppel applied and precluded the Jensens from asserting their state law claims. We first evaluate the propriety of this decision and hold that it was in error. Next, we define our state judicial immunity standard and apply it to uphold the dismissal, as a matter of law, of the claims against defendants Karen Albritton and Susan Eisenman. We then outline the contours of the protections afforded by the Utah Constitution regarding the right of parents to direct the medical care of their children, the right to procedural due process, and the right to be free from unreasonable search and seizure. Based on this discussion, we affirm the summary judgment dismissing the Jensens' claims against the remaining three defendants, Dr. Lars Wagner, Kari Cunningham,

fails to provide any reasons to support the con-

and Richard Anderson. We do so on the alternative ground that monetary damages are not an appropriate remedy for the alleged constitutional violations because, as a matter of law, the conduct of these defendants does not constitute a "flagrant violation" of the Jensens' state constitutional rights.

## I. THE DISTRICT COURT ERRED IN RELYING ON COLLATERAL ESTOPPEL TO DISMISS THE JENSENS' STATE LAW CLAIMS ON SUMMARY JUDGMENT

¶ 39 The district court erred in applying collateral estoppel in this case because the legal standards for state and federal constitutional violations are different. Because the Jensens' state law claims "involve important issues of Utah law," the federal district court declined to exercise supplemental jurisdiction over the claims and instead remanded them to state court. *P.J. ex rel. Jensen v. Utah,* No. 2:05–CV–739 TS, 2008 WL 4372933, at *1, 2008 U.S. Dist. LEXIS 72334, at *3 (D.Utah Sept.22, 2008). The federal district court made no findings with regard to any of the Jensens' state law claims but dismissed, on the merits, all of their federal claims. *Id.*

¶ 40 In deciding the remanded claims, the state district court concluded that the Utah Constitution does not provide greater protections for parental rights than the Federal Constitution. The court ruled that the same set of undisputed facts that were material to the federal claims was also material to the state constitutional claims. And because the federal court determined that those material and undisputed facts were not sufficient to establish a violation of the Jensens' federal constitutional rights, the Jensens were precluded from arguing that their state constitutional rights were violated. The state district court erred in applying collateral estoppel in this way.

¶ 41 Collateral estoppel, otherwise known as issue preclusion, " 'prevents parties or their privies from relitigating *facts and*

tention'').

*issues* in the second suit that were fully litigated in the first suit.' " *Oman v. Davis Sch. Dist.*, 2008 UT 70, ¶ 31, 194 P.3d 956 (quoting *Snyder v. Murray City Corp.*, 2003 UT 13, ¶ 35, 73 P.3d 325). Issue preclusion applies only when the following four elements are satisfied:

> (i) the party against whom issue preclusion is asserted [was] a party to or in privity with a party to the prior adjudication; (ii) the issue decided in the prior adjudication [was] identical to the one presented in the instant action; (iii) the issue in the first action [was] completely, fully, and fairly litigated; and (iv) the first suit ... resulted in a final judgment on the merits.

*Id.* ¶ 29 (quoting *Collins v. Sandy City Bd. of Adjustment*, 2002 UT 77, ¶ 12, 52 P.3d 1267).

██ ¶ 42 To satisfy the second element of this test, the issue to be litigated must be "identical" in both cases. The defendants rely on *Oman* in support of their argument that the issue the state court faced here is identical to the one decided by the federal court. In *Oman,* we held that collateral estoppel barred the plaintiff from litigating his breach of contract claim in state court because a federal court had already determined that the employment contract had not been breached. *Id.* ¶ 32. The "issue" precluded from re-litigation in that case was whether the employment contract had been breached. *Id.* Generally, state law governs the interpretation of contracts. *See, e.g., Summit Contractors, Inc. v. Legacy Corner, L.L.C.,* 147 Fed.Appx. 798, 800 (10th Cir. 2005). The federal court in *Oman* did not indicate a deviation from this norm. Therefore, because the breach of contract issue had been decided by the federal court using the same standard that would be applied in state court, the plaintiff was precluded from relitigating that issue in state court. *See Oman,* 2008 UT 70, ¶ 32, 194 P.3d 956.

¶ 43 But *Oman* is distinguishable from the situation presented here. This case is more analogous to a Maryland case, *Thacker v. City of Hyattsville,* 135 Md.App. 268, 762 A.2d 172 (Md.Ct.Spec.App.2000). There, the state court rejected the application of collateral estoppel after a federal district court dismissed a plaintiff's federal § 1983 claims based on federal qualified immunity standards. *Id.* at 182–83. When faced with the plaintiff's state constitutional claims based on the same series of events considered by the federal court, the state court refused to apply collateral estoppel because "Maryland law governing qualified immunity from state law claims is not 'identical' to federal law governing qualified immunity from section 1983 claims." *Id.* at 183.

¶ 44 The instant case presents a nearly identical scenario to that considered by the Maryland court in *Thacker.* Here, as in *Thacker,* the federal district court applied federal constitutional law and federal immunity standards to dismiss the Jensens' § 1983 claims on summary judgment. *P.J. ex rel. Jensen,* 2008 WL 4372933, at *11–31, 2008 U.S. Dist. LEXIS 72334, at *33–99, *aff'd in part, rev'd in part sub nom., P.J. ex rel. Jensen v. Wagner,* 603 F.3d 1182, 1194–1201 (10th Cir.2010). And the state district court granted summary judgment to the defendants because it determined it was bound by the dispositive issue in federal court—that, as a matter of law, the material and undisputed facts did not give rise to a federal constitutional violation. But the state district court was not considering a federal constitutional violation. Rather, it was considering whether the facts gave rise to cognizable claims of state constitutional violations under state law. The determinations made by the federal judge, under federal law, regarding the materiality of the facts or the inferences that could be drawn from those facts were not dispositive as to questions arising under state law. Thus, unlike the situation in *Oman,* where the legal standard for analyzing a breach of contract claim was the same in both state and federal court, the standards for determining whether a plaintiff is entitled to damages for a state constitutional violation differ from the standards for assessing claims under the federal constitution.

¶ 45 At the most fundamental level, the standards for state and federal constitutional claims are different because they are based on different constitutional language and different interpretive case law. *See, e.g., State v. Tiedemann,* 2007 UT 49, ¶ 34, 162 P.3d

1106 (noting that "Utah's search and seizure provisions (which are identical to those in the federal constitution) provide a greater expectation of privacy than the Fourth Amendment as interpreted by the United States Supreme Court" (internal quotation marks omitted)); *compare, e.g.,* U.S. Const. amend. V (federal "due process" clause), *with* Utah Const. art. I, § 7 (state "due process" clause), *and id.* art. I, § 1 ("inherent and inalienable rights" clause).

¶ 46 While some of the language of our state and federal constitutions is "substantially the same," similarity of language "does not indicate that this court moves in 'lockstep' with the United States Supreme Court's [constitutional] analysis or foreclose our ability to decide in the future that our state constitutional provisions afford more rights than the federal Constitution." *Bailey v. Bayles,* 2002 UT 58, ¶ 11 n. 2, 52 P.3d 1158; *see also Tiedemann,* 2007 UT 49, ¶ 33, 162 P.3d 1106; *West v. Thomson Newspapers,* 872 P.2d 999, 1006 (Utah 1994); *State v. Watts,* 750 P.2d 1219, 1221 n. 8 (Utah 1988). This idea underlies our reasoning in those cases where we have adopted the primacy approach, which dictates an analysis of state constitutional law before addressing any federal constitutional claims. *Tiedemann,* 2007 UT 49, ¶ 33, 162 P.3d 1106; *see also West,* 872 P.2d at 1006. When utilizing this approach, we have stated, "[t]his court, not the United States Supreme Court, has the authority and obligation to interpret Utah's constitutional guarantees ... and we owe federal law no more deference in that regard than we do sister state interpretation of identical state language." *Tiedemann,* 2007 UT 49, ¶ 33, 162 P.3d 1106. Indeed, when a court is confronted with a state constitutional claim, the starting point is the language of the state constitution. *Id.*

¶ 47 In addition to the differences in constitutional language and interpretive case law, the framework for making out a claim for damages for a violation of one's constitutional rights is different under state and federal law. To recover for a violation of the United States Constitution under section 1983 of Title 42 of the United States Code, a plaintiff must "show that the defendant's actions violated a [federal] constitutional or statutory right ... [and] that this right was clearly established at the time of the conduct at issue." *Clark v. Edmunds,* 513 F.3d 1219, 1222 (10th Cir.2008) (internal quotation marks omitted); *see also Pearson v. Callahan,* 555 U.S. 223, 129 S.Ct. 808, 818, 172 L.Ed.2d 565 (2009) (noting that courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first"). The answers to these questions must be based on the language of the Federal Constitution.

¶ 48 In contrast, to recover monetary damages for a violation of the Utah Constitution, a plaintiff must demonstrate that the provision violated by the defendant is self-executing and then must establish three elements: (1) the plaintiff "suffered a flagrant violation of his or her constitutional rights;" (2) "existing remedies do not redress his or her injuries;" and (3) "equitable relief, such as an injunction, was and is wholly inadequate to protect the plaintiff's rights or redress his or her injuries." *Spackman ex rel. Spackman v. Bd. of Educ.,* 2000 UT 87, ¶¶ 18, 23–25, 16 P.3d 533. The answers to these questions must be based on the language of the Utah Constitution.

¶ 49 Without an analysis of the independent protections afforded by our state constitution, the state district court dismissed the Jensens' state law claims because a federal court found that the undisputed material facts did not give rise to a federal constitutional violation. This was error. Because the state and federal standards for determining whether a plaintiff is entitled to damages for a constitutional violation are different, a federal court determination that the material undisputed facts do not give rise to a federal constitutional violation does not preclude a state court from deciding whether those same facts will give rise to a state constitutional violation.[5] Therefore, the state

5. For these same reasons, the law of the case doctrine is inapplicable. The law of the case

doctrine applies to preclude relitigation of an issue when the identical issue was litigated earli-

district court's grant of summary judgment to the defendants solely on the basis of collateral estoppel was in error.

## II. THE UTAH GOVERNMENTAL IMMUNITY ACT DOES NOT SHIELD DEFENDANTS WAGNER AND ALBRITTON, BUT DEFENDANTS EISENMAN AND ALBRITTON ARE IMMUNE FROM THE JENSENS' STATE CONSTITUTIONAL CLAIMS ON THE BASIS OF QUASI–JUDICIAL IMMUNITY

¶ 50 Because we have determined that the district court erroneously applied collateral estoppel, we turn to the merits of the Jensens' claims. But first we address defendants' argument that they are immune from the Jensens' state constitutional claims. Defendants Wagner and Albritton contend that the Utah Governmental Immunity Act shields them from liability. Defendants Albritton and Eisenman argue that they are entitled to quasi-judicial immunity.

### A. *The Governmental Immunity Act Does Not Apply to Claims Alleging State Constitutional Violations*

■ ¶ 51 Dr. Wagner and Dr. Albritton claim immunity under a provision of the Utah Governmental Immunity Act that bars claims against individual state actors unless they act with fraud or malice. Utah Code Ann. § 63–30–4(3)(b)(i) (1997).[6] Their argument is without merit and requires little analysis because the Utah Governmental Immunity Act does not apply to claims alleging state constitutional violations. *See Spackman ex rel. Spackman v. Bd. of Educ.*, 2000 UT 87, ¶ 20 n. 7, 16 P.3d 533; *Bott v. DeLand*, 922 P.2d

732, 736 (Utah 1996) ("[G]overnmental immunity cannot apply where a claimant alleges that the state or a state employee violated his constitutional rights."), *overruled on other grounds by Spackman*, 2000 UT 87, 16 P.3d 533; *Colman v. Utah State Land Bd.*, 795 P.2d 622, 630–31 (Utah 1990) (holding that the Utah Governmental Immunity Act's sovereign immunity protection does not apply to article I, section 22 constitutional takings claims). Thus, defendants Wagner and Albritton are not immune from the Jensens' claims.

### B. *Quasi–Judicial Immunity Bars the Jensens' Claims against Defendants Eisenman and Albritton*

■ ¶ 52 Dr. Albritton and Ms. Eisenman invoke quasi-judicial immunity. The Supreme Court of the United States has recognized the defense of absolute immunity from section 1983 civil rights actions. *See, e.g., Kalina v. Fletcher*, 522 U.S. 118, 131, 118 S.Ct. 502, 139 L.Ed.2d 471 (1997). Under this doctrine, a prosecutor is entitled to absolute prosecutorial immunity from liability arising from alleged constitutional violations that arise out of the prosecutor's performance of "the traditional functions of an advocate."[7] *Id.* We have incorporated and expanded upon this functional approach to insulate advocates and others involved in the judicial process. *See Parker v. Dodgion*, 971 P.2d 496, 498 (Utah 1998). Our immunity test provides protection for a state actor committing acts " 'in the performance of an integral part of the judicial process.' " *Id.* (quoting *Bailey v. Utah State Bar*, 846 P.2d 1278, 1280 (Utah 1993)).

er in the same case. *See IHC Health Servs., Inc. v. D & K Mgmt., Inc.*, 2008 UT 73, ¶ 26, 196 P.3d 588. Because the issues are different under the state and federal constitutions, the law of the case doctrine is inapplicable here.

**6.** This statute has since been revised and renumbered.

**7.** The United States Supreme Court has limited this federal absolute immunity test to exclude any administrative or investigative functions, even if they were performed as part of the judicial process. *See Buckley v. Fitzsimmons*, 509 U.S. 259, 273, 113 S.Ct. 2606, 125 L.Ed.2d 209

(1993). The Utah Court of Appeals has recognized that we have not addressed whether immunity would apply to administrative or investigative functions, but it nevertheless applied this limited immunity test to a claim of fraud. *See Cline v. State*, 2005 UT App 498, ¶ 40, 142 P.3d 127. We have not had the occasion to affirm or reject the court of appeals' application of the state limited immunity test, but we decline in this case to reach the issue because the record does not support the proposition that Ms. Eisenman or Dr. Albritton were performing administrative or investigative functions.

¶ 53 In *Parker v. Dodgion*, we applied this "quasi-judicial immunity" standard to a psychologist who was appointed by the court to assist in making a custody determination. *Id.* We held that the psychologist was performing a function integral to the judicial process by "conducting evaluations and making recommendations regarding custody" and therefore was immune from the plaintiff's claims. *Id.* at 499. Applying a similar quasi-judicial immunity standard, an Ohio appeals court dismissed a plaintiff's civil rights claims against a guardian ad litem because of the guardian ad litem's "role as a court-appointed functionary charged with representing the interests of minor children in the judicial process." *Dolan v. Kronenberg*, No. 76054, 1999 WL 528202, at *3, 1999 Ohio App. LEXIS 3387, at *7–8 (Ohio Ct.App. July 22, 1999).

¶ 54 Defendants Eisenman and Albritton were similarly filling integral roles in the judicial process. Ms. Eisenman was the attorney representing DCFS in the juvenile court proceedings. The Jensens contend that Ms. Eisenman made material misrepresentations to the juvenile court, her supervisor, the district attorney's office, and the Jensens. They also allege that Ms. Eisenman "performed a skewed investigation." But all of Ms. Eisenman's actions that the Jensens allege violated their state constitutional rights were performed in Ms. Eisenman's role as an advocate and necessarily were integral to the judicial process. Similar to the guardian ad litem in *Dolan*, Ms. Eisenman was the court appointed functionary charged with representing the state's interest in the case. Therefore, we hold that her actions are protected by quasi-judicial immunity.

¶ 55 For her part, defendant Dr. Albritton was asked during a juvenile court proceeding to give her expert opinion about the qualifications of doctors, specifically those at the Burzynski Clinic, whom the Jensens suggested should treat Parker. This role was similar to the role fulfilled by the psychologist in *Dodgion*, who offered the court his opinion about the qualifications of the parties seeking custody. Dr. Albritton's conduct was an integral part of the judicial process because it informed the court of the qualifications of the doctors in light of the juvenile court's order that only a board certified oncologist could treat Parker. Accordingly, we hold that Dr. Albritton's actions are also protected by quasi-judicial immunity.

¶ 56 Because defendants Eisenman and Albritton performed acts that were integral to the judicial process, they are immune from the Jensens' state constitutional claims.[8]

III.  THE JENSENS ARE NOT ENTITLED TO PURSUE MONETARY DAMAGES FOR THE ALLEGED VIOLATIONS OF THEIR STATE CONSTITUTIONAL RIGHTS

¶ 57 We now turn to the merits of the constitutional tort claims against the remaining defendants, Dr. Wagner, Ms. Cunningham and Mr. Anderson. The Utah Constitution does not expressly provide damage remedies for constitutional violations. And the Utah Code does not include a statute akin to 42 U.S.C. § 1983. As a result, a plaintiff's remedy for state constitutional violation rests in the common law. *See Spackman ex rel. Spackman v. Bd. of Educ.*, 2000 UT 87, ¶¶ 19–20, 16 P.3d 533. In *Spackman*, we recognized that the common law gives

---

8.  In their reply brief, the Jensens assert that it would be improper for us to decide whether the defendants were protected by quasi-judicial immunity because related issues of fact are in dispute. They also argue that the defendants' material misstatements and omissions demonstrate they acted with malice and that for this reason immunity should not apply. We disagree with both assertions. First, our analysis focuses primarily on a defendant's function within the judicial process, not the manner in which that function is performed. *See Black v. Clegg*, 938 P.2d 293, 296 (Utah 1997) (holding that the filing of an inaccurate certificate was still protected by quasi-judicial immunity despite its errors); *Spielman v. Hildebrand*, 873 F.2d 1377, 1382 (10 Cir.1989) (indicating that the testimony of a child welfare worker was protected by absolute immunity even though the testimony was false). In this case, we have concluded defendants Eisenman and Albritton were performing functions integral to their role in the judicial process. Second, even assuming they were guilty of misstatements or omissions in carrying out their judicial functions, it cannot reasonably be inferred from the facts that the defendants acted with malice, or even that any of the alleged misstatements or omissions were made intentionally.

Utah courts the authority to "accord an appropriate remedy to one injured from the violation of a constitutional provision." *Id.* ¶ 20.

¶ 58 In order to recover damages for the violation of a constitutional provision under *Spackman,* a plaintiff must clear two hurdles. First, the plaintiff must prove that the constitutional provision violated is "selfexecuting." *Id.* ¶ 18. Next, a plaintiff must establish the following three elements: (1) the plaintiff "suffered a 'flagrant' violation of his or her constitutional rights;" (2) "existing remedies do not redress his or her injuries;" and (3) "equitable relief, such as an injunction, was and is wholly inadequate to protect the plaintiff's rights or redress his or her injuries." *Id.* ¶¶ 23–25. Because the common law authority to award damages for constitutional violations invokes policy considerations, a court's discretion in imposing monetary damages should be "cautiously and soundly" exercised. *Id.* ¶ 21. As a result, the *Spackman* test is intended "[t]o ensure that damage actions are permitted only 'under appropriate circumstances.'" *Id.* ¶ 22. Because the Jensens are seeking monetary damages for alleged violations of their state constitutional rights, we must analyze their claims under *Spackman.*

### A. Each of the Constitutional Provisions Relied Upon by the Jensens is Self–Executing

¶ 59 The Jensens must first demonstrate that the provisions they claim defendants violated—article I, sections 1, 7, and 14—are self-executing. "[A] constitutional provision is self-executing if it articulates a rule sufficient to give effect to the underlying rights and duties intended by the framers" or, in other words, "if no ancillary legislation is necessary to the enjoyment of a right given, or the enforcement of a duty imposed." *Spackman,* 2000 UT 87, ¶ 7, 16 P.3d 533 (internal quotation marks omitted). Constitutional provisions that prohibit certain conduct usually are self executing. *Id.* ¶ 8. On the other hand, "constitutional provisions are not self-executing if they merely indicate a general principle or line of policy without supplying the means for putting them into effect." *Id.* ¶ 7 (internal quotation marks omitted).

¶ 60 Prior to *Spackman,* we had expressly found three constitutional provisions to be self-executing: the former version of article XII, section 18 (providing for the liability of bank stockholders); article I, section 22 (the Takings Clause); and article I, section 9 (the Unnecessary Rigor/Cruel and Unusual Punishment Clause). *Id.* ¶ 9.

¶ 61 In *Spackman,* we held that article I, section 7—the due process clause—is self executing. *Id.* ¶ 10. Three characteristics of the clause supported our conclusion. First, we found the clause "inarguably prohibitory," *id.* ¶ 11, especially given the Utah Constitution's declaration that all of its provisions are "'mandatory and prohibitory, unless by express words they are declared to be otherwise.'" *Id.* (quoting Utah. Const. art. I, § 26). Second, the due process clause had been defined and enforced on numerous occasions in the absence of implementing legislation, despite the fact that "the right to due process is expressed in relatively general terms." *Id.* ¶ 12. "Finally, the context in which the clause was adopted suggest[ed] the framers intended to constitutionalize existing concepts of due process rather than create a new provision requiring legislative implementation." *Id.* ¶ 13. We have never considered whether article I, sections 1 or 14 are self executing. We do so now.

### 1. Article I, section 1 is self-executing

¶ 62 Article I, section 1 states that

[a]ll men have the inherent and inalienable right to enjoy and defend their lives and liberties; to acquire, possess and protect property; to worship according to the dictates of their consciences; to assemble peaceably, protest against wrongs, and petition for redress of grievances; to communicate freely their thoughts and opinions, being responsible for the abuse of that right.

Utah Const. art. I, § 1. We hold that this provision is self-executing. First, the provision is prohibitory. By its terms, it prohibits government from infringing upon citizens' "inherent and inalienable" rights and, like

the due process clause, it does not contain express words declaring that it is not "mandatory and prohibitory." Second, like the due process clause, this court has on numerous occasions defined and enforced article I, section 1 without implementing legislation. *See, e.g., Ritholz v. City of Salt Lake,* 3 Utah 2d 385, 284 P.2d 702, 705 (1955) (invalidating city ordinance that prohibited price advertising of eyeglasses because it unduly infringed upon advertiser's article I, section 1 right to "enjoyment of property"); *Golding v. Schubach Optical Co.,* 93 Utah 32, 70 P.2d 871, 875 (1937) (noting that rights guaranteed by article I, section 1 "are invaded when one is not at liberty to contract with others respecting the use to which he may subject his property ... or the manner in which he may enjoy it" (internal quotation marks omitted)).

2. Article I, section 14 is self-executing

¶ 63 Article I, section 14 is also self-executing. It states:

> The right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures shall not be violated; and no warrant shall issue but upon probable cause supported by oath or affirmation, particularly describing the place to be searched, and the person or thing to be seized.

Utah Const. art. I, § 14. The plain language of this section directly prohibits unreasonable searches and seizures without probable cause for a warrant. Such a rule sufficiently gives effect to the underlying rights and duties without implementing legislation. *See Spackman,* 2000 UT 87, ¶ 7, 16 P.3d 533.

¶ 64 Because all of the provisions upon which the Jensens base their claims are self-executing, the Jensens have cleared the first *Spackman* hurdle. We now consider whether money damages are an appropriate remedy for the Jensens' alleged constitutional violations by applying the three-part test we enunciated in *Spackman.*

### B. A Private Suit for Damages is not an Appropriate Remedy for the Alleged Constitutional Violations

¶ 65 Money damages are an appropriate remedy for a constitutional violation only where a plaintiff establishes three elements: (1) the plaintiff "suffered a 'flagrant' violation of his or her constitutional rights;" (2) "existing remedies do not redress his or her injuries;" and (3) "equitable relief, such as an injunction, was and is wholly inadequate to protect the plaintiff's rights or redress his or her injuries." *Spackman,* 2000 UT 87, ¶¶ 23–25, 16 P.3d 533.

¶ 66 The first step inquires whether the defendants' alleged conduct constitutes a "flagrant violation" of the Jensens' constitutional rights. This element is not satisfied unless the conduct violates " 'clearly established' constitutional rights 'of which a reasonable person would have known.' " *Id.* ¶ 23 (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). A right is not clearly established unless its contours are " 'sufficiently clear that a reasonable official would understand that what he is doing violates that right.' " *Id.* (quoting *Anderson v. Creighton,* 483 U.S. 635, 639–40, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). The "flagrant" requirement "ensures that a government employee is allowed the ordinary 'human frailties of forgetfulness, distractibility, or misjudgment without rendering [him or her]self liable for a constitutional violation.' " *Id.* (alteration in original) (quoting *Bott,* 922 P.2d at 740).

¶ 67 The defendants contend that a flagrant violation cannot exist absent clear precedent on point that specifically recognizes the claimed right and applies it to analogous facts. But we believe the flagrant violation standard cannot be so constrained. To be sure, it will be easier for a plaintiff to demonstrate a flagrant violation where precedent clearly establishes that the defendant's alleged conduct violates a provision of the constitution. The converse is also true—in the absence of relevant precedent recognizing the right and prohibiting the alleged conduct, it will be more difficult for a plaintiff to prevail. Nevertheless, we can conceive of instances where a defendant's conduct will be so egregious and unreasonable that it constitutes a flagrant violation of a constitutional right even in the absence of controlling precedent.

¶ 68 With this standard in mind, we now consider the Jensens' specific claims. The Jensens assert the defendants violated their right to direct the medical care of Parker under article I, sections 1 and 7 of the Utah Constitution.[9] The Jensens also allege violations of their procedural due process rights under the same provision. Finally, the Jensens allege a violation of their right under article I, section 14 to be free from unreasonable custodial and non-custodial seizures. For each alleged violation, we first review the scope of the claimed right and then consider the facts under the summary judgment standard to determine whether the Jensens have identified facts or disputed issues of fact giving rise to a "flagrant violation."

¶ 69 When analyzing the rights afforded by our state constitution, we begin the discussion "with a review of the constitutional text." *Dexter v. Bosko*, 2008 UT 29, ¶ 11, 184 P.3d 592. "We also 'inform our textual interpretation with historical evidence of the framers' intent.' Finally, we may consider well-reasoned and meaningful decisions made by courts of last resort in sister states with similar constitutional provisions." *Id.* (quoting *Am. Bush v. City of S. Salt Lake*, 2006 UT 40, ¶ 10, 140 P.3d 1235). We address each of the Jensens' claimed rights in turn, beginning with the asserted parental right to direct the medical care of one's children.

1. Article I, Sections 1 and 7 Guarantee Parents a Right to Direct the Medical Care of Their Child, but the Right Is Not Absolute

¶ 70 The Jensens claim that article I, sections 1 and 7 vest in parents a right to direct their child's medical care free from governmental interference, unless such governmental interference is narrowly tailored and in furtherance of a compelling state interest. They contend that defendants' conduct constitutes a "flagrant violation" of this "fundamental" substantive right.

¶ 71 We begin with a discussion of article I, section 7, our state constitution's "due process clause." Like its federal counterpart, article I, section 7 provides that "[n]o person shall be deprived of life, liberty or property, without due process of law." Utah Const. art. I, § 7.

¶ 72 In a long line of precedent, this court has recognized parental rights as a fundamental component of liberty protected by article I, section 7. For example, as early as 1907 we suggested that removal of a child from his parent's custody is unconstitutional unless the parent has been found unfit. *See Mill v. Brown*, 31 Utah 473, 88 P. 609, 613 (1907) ("Before the state can be substituted to the right of the parent it must affirmatively be made to appear that the parent has forfeited his natural and legal right to the custody and control of the child by reason of his failure, inability, neglect, or incompetency to discharge the duty and thus to enjoy the right."). And in *In re J.P.*, we noted that "[a] parent has a fundamental right, protected by the Constitution, to sustain his relationship with his child." 648 P.2d 1364, 1372 (Utah 1982) (internal quotation marks omitted). We recognized that "[t]he integrity of the family and the parents' inherent right and authority to rear their own children have been recognized as fundamental axioms of Anglo–American culture, presupposed by all our social, political, and legal institutions." *Id.* at 1373. Applying these principles, we held unconstitutional a statute that permitted the juvenile court to terminate established parental rights solely upon a finding that

---

9. The Jensens actually alleged violations of several rights purportedly encompassed by article I, sections 1 and 7, including: (1) parents' right to direct their child's medical care free from governmental interference, unless such interference is narrowly tailored and in furtherance of a compelling state interest; (2) parents' right to follow medical recommendations of a licensed physician of their choosing, unless the State can establish that the recommendations are substantially below the norm; (3) parents' right not to be reported to the State for neglect because the parents are seeking confirmation of a diagnosis before implementing a state actor's medical recommendations; and (4) parents' right to an investigation of the reporting party's allegations before being forced to defend against State efforts to transfer custody in order to impose medical procedures on a child. Because all of these alleged violations ultimately arise under an asserted general right to direct the medical care of one's child, we consolidate our analysis of the specific claims.

termination would be in the child's best interests. *Id.* at 1374. In so doing, we recognized that a parent has a due process right under article I, section 7 to maintain parental ties to his or her child. *Id.* at 1375, 1377. A statute that infringes upon this "fundamental" right is subject to heightened scrutiny and is unconstitutional unless it (1) furthers a compelling state interest and (2) "the means adopted are narrowly tailored to achieve the basic statutory purpose." *Wells v. Children's Aid Soc'y of Utah*, 681 P.2d 199, 206 (Utah 1984) (internal quotation marks omitted).

¶ 73 These cases stand primarily for the proposition that a parent possesses a fundamental right to maintain ties to his or her child. *In re J.P.*, 648 P.2d at 1377; *Wells*, 681 P.2d at 206–07. But their holdings do not directly embrace a broader, more encompassing fundamental right to direct medical care. And the Jensens have not cited to any other authority—from this or any other jurisdiction—that squarely supports such an expansive reading of article I, section 7. Nevertheless, it is clear from our precedent that parents have a fundamental right to make decisions concerning the care and control of their children. And this general right necessarily encompasses the more specific right to make decisions regarding the child's medical care.

¶ 74 It is equally well established, however, that although "fundamental," parental rights are not absolute. A parent's rights must be balanced against the state's important interest in protecting children from harm. *See In re J.P.*, 648 P.2d at 1377 ("The principle that the welfare of the child is the paramount consideration means that parental rights, though inherent and retained, are not absolute . . . ." (internal quotation marks omitted)); *id.* at 1382 (Stewart, J., dissenting) ("[T]he correlative of parental rights is parental duties. When parents fail to, or are incapable of, performing their parental obligations, the child's welfare must prevail over the right of the parent."); *Soper v. Dillon (In re Storar)*, 52 N.Y.2d 363, 438 N.Y.S.2d 266, 420 N.E.2d 64, 73 (1981) ("[A

parent] may not deprive a child of lifesaving treatment, however well intentioned. Even when the parents' decision to decline necessary treatment is based on constitutional grounds, such as religious beliefs, it must yield to the State's interests, as *parens patriae*, in protecting the health and welfare of the child." (citations omitted)). This is especially the case where a child's life is endangered.

¶ 75 Utah statutes in effect during the events that gave rise to this case accurately reflect the delicate balance between constitutionally protected parental rights and the state's interest in ensuring the health and safety of children within its borders. For example, Utah Code section 62A–4a–201 provided as follows: "Courts have recognized a general presumption that it is in the best interest and welfare of a child to be raised under the care and supervision of his natural parents." UTAH CODE ANN. § 62A–4a–201(1) (Supp.1997).[10] It added that "[t]he right of a fit, competent parent to raise his child has long been protected by the laws and Constitution of this state and of the United States." *Id.* Counterbalanced against this express recognition of fundamental parental rights, however,

> the state, as parens patriae, has an interest in and responsibility to protect children whose parents . . . do not adequately provide for their welfare. There are circumstances where a parent's conduct or condition is a substantial departure from the norm and the parent is unable or unwilling to render safe and proper parental care and protection. Under those circumstances, the welfare of children is the consideration of paramount importance.

*Id.* § 62A–4a–201(2). "When circumstances within the family pose a threat to the child's safety or welfare, the state's interest in the child's welfare is paramount to the rights of a parent." *Id.* § 62A–4a–201(4).

¶ 76 The state appropriately takes its parens patriae responsibility seriously. In fact, any person, including a medical professional, who has reason to believe that a child has been subjected to neglect is required to report the abuse either to law enforcement or

---

**10.** The statutes have since undergone minor revi- sion. None of these revisions alters our analysis.

DCFS. *Id.* § 62A–4a–403(1). And the statutory definition of neglect includes a parent's failure to provide proper or necessary medical care or any other care necessary for the child's health. *Id.* § 62A–4a–101(14)(a)(iv). A person required to report who "willfully fails to do so" is subject to criminal liability. *Id.* § 62A–4a–411. And, any person who "participat[es] in good faith in making a report" of neglect or "assist[s] an investigator from [DCFS]" is immune from liability that might otherwise arise by reason of such conduct. *Id.* § 62A–4a–410.

¶ 77 The Jensens have not challenged the constitutionality of the above statutory scheme, which reflects the scope of protection afforded by article I, section 7 to a parent's right to direct medical care. However, the Jensens seek to buttress their article 1, section 7 argument with article 1, section 1. That provision states that

> [a]ll men have the inherent and inalienable right to enjoy and defend their lives and liberties; to acquire, possess and protect property; to worship according to the dictates of their consciences; to assemble peaceably, protest against wrongs, and petition for redress of grievances; to communicate freely their thoughts and opinions, being responsible for the abuse of that right.

Utah Const. art. I, § 1. As the Jensens concede, "[t]here are no Utah cases in which the parties have raised [article 1, section 1] in the parent-child context." Faced with this absence of authority, the Jensens argue that, by its language, section 1 promotes the "inherent rights of defending life and liberty" and because we have, in *In re J.P.* and *Wells,* determined that parents possess an inherent fundamental liberty interest under article 1, section 7 to rear their children, these provisions necessarily protect a parent's fundamental right to direct medical care. But the Jensens have failed to support their argument with relevant case law, statutes, or historical evidence.

¶ 78 Although the Utah Constitution protects parental rights to direct the medical care of their children, those rights must be balanced against the state's responsibility to further the health and safety of children. Accordingly, when a child's life or health is endangered by his or her parents' decisions regarding the child's medical care, the state may, in some circumstances, temporarily intervene without violating the parents' constitutional rights. With this framework in mind, we consider the Jensens' specific claims against Dr. Wagner, Ms. Cunningham, and Mr. Anderson.

a. Dr. Wagner's Conduct Does Not Amount to a Flagrant Violation of the Jensens' Right to Direct the Medical Care of Parker

¶ 79 The Jensens allege Dr. Wagner committed several violations of their constitutional right to direct Parker's medical care. First, they contend Dr. Wagner made material factual misrepresentations and omissions to DCFS, the juvenile court, and others in order to induce a transfer of custody. The Jensens also contend that Dr. Wagner interfered with the Jensens' request for independent confirmation by contacting and attempting to influence the reviewing physician at Dana–Farber. Finally, the Jensens allege that Dr. Wagner reported them to the State for medical neglect because they informed Primary Children's that they were going elsewhere to seek confirmation of the diagnosis.

¶ 80 There is no evidence in the record from which it can be inferred that Dr. Wagner's conduct was motivated by anything other than a reasonable belief that Parker was in danger of serious harm. We agree with the federal district court that "the Jensens ask the [c]ourt to draw a number of unreasonable inferences, which the record plainly will not support, in order to attribute a more dubious purpose to Dr. Wagner's actions." *P.J. ex rel. Jensen v. Utah,* No. 2:05–CV–739 TS, 2008 WL 4372933, at *18, 2008 U.S. Dist. LEXIS 72334, at *55 (D.Utah Sept.22, 2008).

¶ 81 For example, the Jensens assert that Dr. Wagner was a "co-investigator" of a clinical trial for which Parker might have been eligible, suggesting that Dr. Wagner wanted to get Parker enrolled into the trial, and that he was motivated by this desire rather than Parker's medical interests. But the Jensens have not pointed to any evidence that Dr.

Wagner was a co-investigator of the study. In fact, the study for which Parker was possibly eligible was a Phase III Clinical Trial. Dr. Wagner was involved in only one clinical trial while he was at Primary Children's, and it was a Phase I study.

¶ 82 Additionally, it is undisputed that under the study's eligibility criteria, a patient could be enrolled in the trial only within thirty days of the "diagnostic biopsy." Dr. Wagner had calendered the date of Parker's biopsy as May 2, 2003. Thus, by June 2, Parker was no longer eligible to participate in the trial. If Dr. Wagner's real motivation was to get Parker enrolled, he almost certainly would have ceased pressing after the June 2 deadline. But he did not. In fact, it was not until June 16 that Parker's case was referred to DCFS. Seeking to avoid this conclusion, the Jensens assert that Dr. Wagner had cited a medical article that measured the deadline for enrollment in the study from the date of diagnosis, which would have been May 20. But like the claim that Dr. Wagner was a "co-investigator" of the study, this assertion is unsupported in the record.

¶ 83 Turning to the Jensens' specific allegations, there simply is no evidence from which it can be reasonably inferred that Dr. Wagner deliberately misrepresented the events and circumstances surrounding Parker's medical care. Even assuming Dr. Wagner withheld information or otherwise gave a less than complete picture of the circumstances surrounding Parker's care, there is no evidence that he did so deliberately.

¶ 84 Regarding Dr. Wagner's alleged interference with the Jensens' request for a second opinion at Dana–Farber, we have reviewed the alleged offending communication between Dr. Wagner and the institute, and we conclude that it does not support a reasonable inference that Dr. Wagner attempted to interfere with the second opinion sought by the Jensens.

¶ 85 The Jensens' final allegation—that Dr. Wagner reported them to the State for medical neglect because they informed Primary Children's that they were going elsewhere to seek confirmation of the diagnosis—is also devoid of support in the record. It is simply a bald allegation.

¶ 86 In sum, there is nothing to support a reasonable inference that Dr. Wagner was not motivated by a legitimate concern for Parker's care. The Jensens have not pointed to any admissible evidence from which it can reasonably be inferred that Dr. Wagner committed a flagrant violation of the Jensens' constitutional rights, especially given that neither this Court nor the Utah Court of Appeals has previously addressed the scope of a parent's right to direct the medical care of his or her child.

b. Ms. Cunningham's Conduct Does Not Amount to a Flagrant Violation of the Jensens' Right to Direct Parker's Medical Care

¶ 87 The Jensens contend that Ms. Cunningham committed two violations of their constitutional rights. First, they contend Ms. Cunningham failed to conduct any investigation of the medical neglect allegations. Specifically, they claim she had a duty under Utah law to investigate Parker's referral and that had she undertaken such an investigation, she would have discovered several misrepresentations and omissions made by Dr. Corwin and Dr. Wagner. But this claim fails because there is no evidence to indicate that Ms. Cunningham had reason to question the veracity of the information and opinions given to her by Drs. Wagner and Corwin. Even if Ms. Cunningham had a duty to investigate, we simply are unwilling to say that her decision to rely solely on a medical professional's report in what she reasonably perceived was an emergency situation constitutes a flagrant violation of the parental right to direct a child's medical care.

¶ 88 The Jensens' second claim is that Ms. Cunningham submitted an affidavit to the juvenile court that contained misleading information. In the affidavit, Ms. Cunningham stated that a sample of Parker's tissue was sent to Dana–Farber for a second opinion, but did not state that the second opinion was never given. Additionally, the affidavit states that Parker underwent a CT and bone scan, but omits the fact that the test results were normal. It also states that

the Jensens were pursuing IPT, when Ms. Cunningham knew they were not. Finally, Ms. Cunningham's affidavit omitted the fact that she had not spoken to Dr. Coffin, and in it Ms. Cunningham claimed that Dr. Tishler had said Parker should commence chemotherapy, when she knew he had actually said that he would not be making final treatment recommendations until all of the testing was complete.

¶ 89 Ms. Cunningham has admitted that in hindsight some of the information in the affidavit was potentially misleading. Nevertheless, we conclude that the omissions or misstatements were largely immaterial to the juvenile court proceedings. And the Jensens have offered no evidence to suggest Ms. Cunningham was motivated by anything other than a desire to further the best interests of Parker. Thus, the Jensens have provided no evidence from which it can reasonably be inferred that Ms. Cunningham committed a flagrant violation of the Jensen's right to direct Parker's medical care.

c. Mr. Anderson's Conduct Does Not Amount to a Flagrant Violation of the Jensens' Right to Direct Parker's Medical Care

¶ 90 The Jensens contend that Mr. Anderson committed several violations of the Jensens' right to direct Parker's care. First, the Jensens claim Mr. Anderson imposed a "standard of comparative fitness on the Jensens," under which he took the position that, if there were conflicting opinions between a parent's physician and a physician upon whom the State is relying, the parents could not make their own choice. Second, the Jensens contend Mr. Anderson refused to authorize the dismissal of the neglect proceedings unless Parker was placed in the care of a board certified pediatric oncologist.

¶ 91 These two allegations lack merit. By the time Mr. Anderson became involved in Parker's case in late August 2003, the juvenile court had already ordered Parker to begin chemotherapy administered by a board certified pediatric oncologist and had placed him in the state's protective custody because the Jensens had missed the court-imposed deadline. In this sense, Mr. Anderson did not impose any standard upon the Jensens; any standard imposed was imposed by the juvenile court, which had ordered that Parker must be treated with chemotherapy by a board certified pediatric oncologist. Based on these undisputed facts, the position taken by Mr. Anderson, including his refusal to dismiss the proceedings unless the Jensens placed Parker in the care of a board certified pediatric oncologist, was in accord with the juvenile court order.

¶ 92 The Jensens also allege that Mr. Anderson told them that he would not include additional diagnostic testing as part of DCFS's pursuit of the medical neglect allegations unless the Jensens agreed to place Parker in foster care. Given the timing of Mr. Anderson's involvement, even if it were true that Mr. Anderson told the Jensens that additional testing was contingent upon Parker's placement in foster care, the statement was immaterial. By the time Mr. Anderson became involved, the juvenile court had already granted protective custody of Parker to the State. Mr. Anderson's statement therefore had no effect upon the juvenile court proceedings and caused the Jensens no damage.

¶ 93 The Jensens' final claim is that Mr. Anderson had knowledge that Dr. Johnston had decided to recommend chemotherapy before receiving the results of the genetic tests in violation of the September 5, 2003 stipulation and failed to inform the juvenile court of this fact. This allegation is unsupported by the record. Even assuming it is true that Dr. Johnston violated the stipulation by recommending chemotherapy before the genetic testing results were back, the Jensens have offered no evidence from which it can reasonably be inferred that Mr. Anderson knew that such conduct would be a violation of the stipulation.

¶ 94 Mr. Anderson became involved in this case only after the State had been granted protective custody of Parker and the Jensens had violated the juvenile court order requiring them to begin chemotherapy by August 8. His role was limited to trying to bring the Jensens into compliance with the juvenile court orders so Parker could get what was considered medically necessary care. His

actions did not violate the Jensens' right to direct the medical care of Parker.

## 2. The Right to Procedural Due Process

■■ ¶ 95 The Jensens also claim that their procedural due process rights were violated by defendants Wagner and Cunningham. Article I, section 7 of the Utah Constitution contains a procedural component. Under it, "notice and opportunity to be heard ... must be observed in order to have a valid proceeding affecting life, liberty, or property." *Wells v. Children's Aid Soc'y of Utah,* 681 P.2d 199, 204 (Utah 1984). Additionally, "[t]o be considered a meaningful hearing, the concerns of the affected parties should be heard by an impartial decision maker." *Chen v. Stewart,* 2004 UT 82, ¶ 68, 100 P.3d 1177 (internal quotation marks omitted).

■ ¶ 96 The Jensens assert that Dr. Wagner's and Ms. Cunningham's "reckless or intentional misrepresentations" rendered the juvenile court proceedings so unfair as to violate the Jensens' procedural due process rights. To support their misrepresentation claim, the Jensens cite *Walker v. State,* in which we noted, "It is an accepted premise in American jurisprudence that any conviction obtained by the knowing use of false testimony is fundamentally unfair and totally incompatible with rudimentary demands of justice." 624 P.2d 687, 690 (Utah 1981) (internal quotation marks omitted). But even assuming *Walker* is applicable in this civil case, there is no evidence in the record that either Dr. Wagner or Ms. Cunningham deliberately made false statements or material omissions to the juvenile court.

¶ 97 The Jensens also claim Ms. Cunningham's failure to investigate the medical neglect allegations deprived them of an opportunity to be heard in a meaningful way. This claim also fails. At the juvenile court, the Jensens were free to challenge Ms. Cunningham's allegations, including the circumstances surrounding them. The Jensens were provided with adequate notice and a meaningful opportunity to be heard. Consequently, neither Ms. Cunningham nor Dr. Wagner committed a flagrant violation of the Jensens' procedural due process rights.[11]

## 3. The Jensens' Right to Be Free from Unreasonable Seizures

■ ¶ 98 The Jensens' final claim is that their rights under article I, section 14 to be free from unreasonable seizure were violated when Mr. Jensen was arrested in Idaho in August 2003 and when both parents were "booked and released in Utah in September 2003." This court has recognized that while article I, section 14 and the Fourth Amendment of the United States Constitution have identical language, "we will not hesitate to give the Utah Constitution a different construction where doing so will more appropriately protect the rights of this state's citizens." *State v. DeBooy,* 2000 UT 32, ¶ 12, 996 P.2d 546. But we have also stated that, "[u]nder both constitutions, the general rule is that [unless] 'specific and articulable facts ... taken together with rational inference from those facts ... reasonably warrant' the particular intrusion," the intrusion is unconstitutional. *Id.* ¶ 13 (third alteration in original) (quoting *Terry v. Ohio,* 392 U.S. 1, 21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). Therefore, it cannot be a flagrant violation of article I, section 14 if there was a reasonable basis to warrant the particular intrusion or, in other words, if there was probable cause for an arrest.

■ ¶ 99 The Jensens contend that Mr. Jensen's seizure was unreasonable because it resulted from "culpable material misrepresentations." But Mr. Jensen was arrested only after the Jensens violated the juvenile court order that required the Jensens to begin chemotherapy by August 8. With respect to defendant Dr. Wagner, the alleged

---

11. In addition, even if we were to conclude that a flagrant violation of the Jensens' procedural due process rights occurred, monetary damages nonetheless would be an inappropriate remedy because the Jensens have failed to establish the third *Spackman* element, "that equitable relief ... was and is wholly inadequate to [protect the plaintiff's rights or] redress [their] injuries." *Spackman,* 2000 UT 87, ¶ 25, 16 P.3d 533. Procedural due process violations are "particularly amenable to redress through equitable means [because] [s]uch relief can be precisely tailored to grant the very thing a plaintiff alleges has been wrongfully denied—due process." *Id.* ¶ 25 n. 11.

seizure took place after he left Primary Children's and was succeeded by Dr. Albritton. In fact, there is no evidence that Dr. Wagner had any involvement in the procurement of the warrant that led to the arrest of Mr. Jensen. Therefore, Dr. Wagner could not have committed a flagrant violation of Mr. Jensen's rights under article I, section 14.

¶ 100 Ms. Cunningham did have some involvement in the events leading to Mr. Jensen's arrest. She signed an affidavit supporting the Application to Take a Child into Protective Custody after the Jensens missed the deadline for Parker to begin chemotherapy. Additionally, she informed the district attorney of the inability to serve the court issued warrant on the Jensens because they had left the state. This resulted in criminal charges against Mr. and Mrs. Jensen and the subsequent arrest of Mr. Jensen. The fact remains, however, that Ms. Cunningham was doing nothing more than attempting to enforce a juvenile court order that the Jensens were violating. A direct violation of a court order is probable cause for an arrest or seizure and therefore is a reasonable intrusion of rights under the Utah constitution. *See, e.g.,* UTAH CODE ANN. § 77–18–1(12)(b)(ii) (2008) (authorizing a warrant for the arrest of a probationer in violation of court ordered probation); *Goings v. Elliot,* No. C 08–2544 PJH, 2010 U.S. Dist. Lexis 26015, at *15–22 (N.D.Cal. Mar. 19, 2010) (holding that probable cause existed to arrest or detain plaintiff for violation of a court order). Because the Jensens were in direct violation of the juvenile court order, the actions taken by Ms. Cunningham to effectuate their arrest were supported by probable case. Thus, Ms. Cunningham's actions were reasonable and warranted the intrusion on the Jensens' constitutional rights under article I, section 14.

¶ 101 The Jensens also argue that they suffered an unreasonable noncustodial seizure in violation of article I, section 14. According to the Jensens, a noncustodial seizure is one that results from state-imposed conditions that significantly, but not physical-ly, restrict liberty. This court has never recognized that our Constitution guarantees a right to be free from unreasonable noncustodial seizure. As such, the right is not clearly established.

¶ 102 The Jensens nonetheless contend that the following is evidence of a flagrant violation of their purported right: They were unable to return to their home state without threat of arrest and removal of Parker; they were unable to take Parker for an evaluation in Houston, or to other physicians of their choosing; they were subjected to mandatory court appearances; they were ordered to give up their passports; Mr. Jensen lost his job; and, finally, they were subjected to media scrutiny and public ridicule. The Jensens claim that all of this amounts to such a significant restriction of their liberty that it constitutes a violation of their state constitutional rights.

¶ 103 We have already concluded that the defendants' conduct was motivated by a legitimate concern for Parker's life. Thus, in the absence of any precedent suggesting such an expansive reading of article I, section 14, we cannot conclude that the defendants' conduct constitutes a flagrant violation of the Jensens' rights.

## CONCLUSION

¶ 104 The state district court erred in applying collateral estoppel because the legal standard for state and federal constitutional violations is not identical. We nonetheless affirm the district court's order on alternative grounds that are apparent in the record. Specifically, we hold that the Jensens' claims against defendants Eisenman and Albritton are barred under the doctrine of quasi-judicial immunity because the claims arise out of the defendants' roles in which they played an integral part in the judicial process. The claims against the remaining three defendants fail because, as a matter of law, the Jensens did not meet their burden of demonstrating that damages are an appropriate remedy for the alleged unconstitutional conduct.

¶ 105 Chief Justice DURHAM, Associate Chief Justice DURRANT, Justice NEHRING, and Judge ORME concur in Justice PARRISH'S opinion.

¶ 106 Due to his retirement, Justice WILKINS did not participate herein. Judge GREGORY K. ORME sat.

¶ 107 Justice THOMAS R. LEE became a member of the Court on July 19, 2010, after oral argument in this matter, and accordingly did not participate.